IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

| | |
|---|---|
| MID-AMERICA APARTMENT COMMUNITIES, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DENNIS MICHAEL PHILIPSON, )<br>)<br>Defendant. ) | No. 2:23-cv-2186-SHL-cgc |

**ORDER ASSESSING MONETARY SANCTIONS
FOR VIOLATIONS OF PERMANENT INJUNCTION**

On September 12, 2025, the Court entered an Order Granting Plaintiff's Motions for Contempt and Establishing Protocol for Evaluating Future Instances of Alleged Contemptuous Behavior. (ECF No. 285.) In that Order, the Court found that pro se Defendant Dennis Michael Philipson was in contempt for violations of the permanent injunction in place in this case, adopted a protocol for assessing the penalties for those violations, and described the penalties that will be imposed against him based on any future violations that Plaintiff Mid-America Apartment Communities, Inc. ("MAA"), could demonstrate to the Court. The Court explained that it would "assess monetary sanctions in the amount of $50 per violation for each of Mr. Philipson's past violations of the permanent injunction." (Id. at PageID 5265.)

The Court further explained that,

The total number of violations shall be determined upon Plaintiff's submission of a declaration of proof on the number of violations, including:

- Each distinct act of impersonating MAA or its employees;
- Each distinct act of maintaining or creating misleading social media accounts;
- Each unauthorized email sent to MAA employees or representatives;

- Each whistleblower submission received through MAA's internal reporting platform;
- Each distinct act of disseminating information in violation of Paragraph 11 of the Injunction:
- Any physical trespass as shown in the record;
- Any other violations of the permanent injunction Mr. Philipson has committed.

MAA shall provide the declaration of proof as to these past violations within seven days of the entry of this Order. Mr. Philipson may file a response to the declaration within seven days, but the response shall be limited to addressing the specific instances of violations outlined in MAA's filing. After considering MAA's declaration of proof and Mr. Philipson's response to it, the Court will use the formula outlined above to determine the penalties Mr. Philipson shall face for his past violations of the permanent injunction.

(Id. at PageID 5265–66.)

On September 24, 2025, the Court entered an Order for Plaintiff to Show Cause after MAA missed its deadline to file its declaration of proof. (ECF No. 290.) The same day, MAA filed the Declaration of Proof of Alex Tartera, MAA's senior vice president of information security and privacy (the "Tartera Declaration."). (ECF No. 291.) The Tartera Declaration outlines hundreds of instances in which Mr. Philipson allegedly violated the terms of the permanent injunction, including by attempting to and sending emails to MAA employees, purchasing a domain name containing MAA's trademarks, signing up MAA employees for emails, applying for jobs in the name of an MAA employee, using an alias to apply for jobs at MAA, and making hundreds of submissions to MAA's Whistleblower Portal with false and defamatory allegations that have been investigated numerous times and determined to be without merit. (See id.) The Tartera Declaration included ten attachments with proof that supported the allegations.

The next day, Jordan E. Thomas, counsel for MAA, submitted another declaration of proof (the "Tartera Declaration"). (ECF No. 293.) In it, Thomas detailed additional instances

2

where Mr. Philipson violated the terms of the permanent injunction, and included an exhibit with a table that included those violations, as well as the hundreds that were detailed in Tartera's declaration. (ECF No. 293-1.) In sum, the table included 1,363 instances where Mr. Philipson violated the permanent injunction. (Id. at PageID 5408.)

The same day the Tartera Declaration was filed, Mr. Philipson filed what he deemed to be his Combined Notice of Email Contact/Consent to Electronic Service and Response to Plaintiff's New Declaration. (ECF No. 292.)[1] Mr. Philipson's response was not, as the Court directed, limited to addressing the specific instances of violations outlined in MAA's filing. The response also does not refute that Mr. Philipson was responsible for the communications outlined in the Tartera Declaration, or challenge the veracity of Tartera's other allegations, including those related to Mr. Philipson's purchase of a domain name containing MAA's trademarks, that he signed up MAA employees for emails, applied for jobs in the name of an MAA employee, and used an alias to apply for jobs at MAA.

Instead, Mr. Philipson asserts that the materials attached to the Tartera Declaration "do not rebut my positions; they primarily demonstrate that MAA and a broad cross-section of its employees and executives were on actual notice of the issues I have raised, including court-process misconduct, antitrust violations tied to RealPage pricing practices, and securities/internal-controls concerns." (Id. at PageID 5390.) As to his recent filings on the MAA whistleblower portal, he asserts that MAA's lawyers did not respond to or acknowledge receipt of his recent filing in the Virginia court, so he "provided notice directly through MAA's whistleblower line to ensure the company received it." (Id. at PageID 5391–92.)

---

[1] Mr. Philipson did not respond to the filing of Thomas' declaration, and his time to do so has passed.

3

On October 1, 2025, MAA filed its Response to the Order to Show Cause, which including as an attachment the Declaration of Robert J. DelPriore. (ECF Nos. 295, 295-1.) In his declaration, DelPriore, MAA's Executive Vice President, Chief Administrative Officer and General Counsel, offered several reasons for why he was unable to assist Tartera in filing a timely declaration. Those reasons included that MAA's chief litigation counsel left the company on September 12, DelPriore was out of town on September 15–17 and 19–21 and had to prepare for MAA's board meeting, which was held September 22–23, and that Tartera had to make a cyber security presentation to the board of directors on September 22. (ECF No. 295-1 at 5440.)

A little more than an hour after MAA filed its response, Mr. Philipson responded to it. (ECF No. 296.) In that response, Mr. Philipson explained that he "agrees with Mr. DelPriore and does not oppose the Court considering all three materials—i.e., the DelPriore declaration and the Tartera and Thomas declarations of proof—for purposes of resolving the Order to Show Cause." (Id. at PageID 5443.) He explained that he waives any procedural objection to consideration of the earlier filings, but does not concede any of the merits of the underlying filings. (Id. at PageID 5444.) He asks the "Court to deem the [Order to Show Cause] satisfied and close it, and to avoid any further continuances or holds premised on declaration timing." (Id. at PageID 5444.) Ultimately, he "respectfully requests that this Court accept and consider the declarations, find the Order to Show Cause satisfied, permit the Virginia judgment to go forward on October 3, 2025, and decline to further hold up the enforcement process." (Id. at PageID 5447.)

## LEGAL STANDARD

Civil contempt serves two purposes: "to enforce, through coerciveness, compliance with a court's order" and "to compensate a party who has suffered unnecessary injuries or costs because of the contemptuous conduct." Consol. Rail Corp. v. Yashinsky, 170 F.3d 591, 595 n.5

4

(6th Cir. 1999) (quoting Petroleos Mexicanos v. Crawford Enters., Inc., 826 F.2d 392, 400 (5th Cir. 1987)). "In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that 'he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order.'" Elec. Workers Pension Tr. Fund of Loc. Union |58, IBEW v. Gary's Elec. Serv. Co., 340 F.3d 373, 379 (6th Cir. 2003) (quoting NLRB v. Cincinnati Bronze, Inc., 829 F.2d 585, 591 (6th Cir. 1987)); see also Rolex Watch U.S.A., Inc. v. Crowley, 74 F.3d 716, 720 (6th Cir. 1996) (requiring clear and convincing evidence of noncompliance to hold a party in civil contempt).

## **ANALYSIS**

Before addressing the substance of MAA's declarations of proof, the Court notes that, according to DelPriore's declaration, MAA's chief litigation counsel left the company on September 12, the same day that the Court entered its Order Granting Plaintiff's Motions for Contempt and Establishing Protocol for Evaluating Future Instances of Alleged Contemptuous Behavior. It is unclear whether that departure was abrupt or unexpected, but, in any event, the bulk of the subsequent events that purportedly impeded the production of the declarations of proof took place on or after the deadline to produce them. Moreover, MAA did not seek additional time from the Court to provide the declarations of proof, and only produced them after the Court entered its Order to Show Cause five days after they were due.[2] Nevertheless, given the short delay, as well as the fact that Mr. Philipson does not oppose the consideration of the declarations of proof, the Court is satisfied that it should consider their substance, and does so now.

---

[2] MAA is cautioned to meet its deadlines or seek an extension of time in the future.

5

The Court begins with Mr. Philipson's response to Tartera's declaration. Beyond violating the Court's directive by recapitulating many of the arguments he has made throughout the litigation as to the illegitimacy of the proceedings against him, Mr. Philipson essentially admits in his response that he is responsible for the communications described in the Tartera and Thomas declarations. He asserts that "the email-log materials attached by Plaintiff primarily confirm broad internal awareness within MAA of the issues I have raised." (Id. at PageID 5392.) He further asserts that "Plaintiff's own attachments confirm that MAA received my communications across the organization, including distribution to CEO-, CFO-, and other executive-level recipients." (Id. at PageID 5397–98.) Ultimately, Mr. Philipson asserts that "[t]hese records operate as admissions of notice, not exculpatory proof." (Id. at PageID 5398.) According to Mr. Philipson, he "used email to preserve evidence, place MAA on formal notice, and mitigate further misconduct. The volume and distribution reflected in Plaintiff's own logs confirm those notices were received and internalized at the highest levels of MAA." (Id. at PageID 5399.)

Essentially, MAA's declarations provided smoking-gun evidence that Mr. Philipson violated the terms of the permanent injunction, indeed did so repeatedly, and, rather than suggest that he was not responsible for the firing of the weapon, Mr. Philipson asserts that he was justified in doing so. But the permanent injunction's terms are clear, and explain, among other things, that Mr. Philipson, "whether under his own name or a false name, and those in active concert with him, are enjoined and barred from contacting any individual MAA Person in person or by phone, electronic mail, text message, social media, direct message, or any other method, without the express written consent of such person." (ECF No. 97 at PageID 1567–68.) The permanent injunction does not include any exceptions that would allow Mr. Philipson to

6

communicate with MAA personnel about such things as "RealPage-based antitrust conduct," "casualty-loss and internal-controls issues," or "court-process irregularities and baseless criminal insinuations," which he asserts were the topics of his communications. (ECF No. 292 at PageID 5398.) The communications that Mr. Philipson admits to making all violate the permanent injunction, and he is liable for each of them.

At the same time, the permanent injunction included a provision that "[n]othing in this Order shall in any way limit Defendant's right to make whistleblowing complaints or to otherwise communicate with a government agency, as provided for, protected under, or warranted by applicable law." (ECF No. 97 at PageID 1569.) If Mr. Philipson was unclear that his sending of 429 submissions through MAA's whistleblower portal between January and September 12, 2025, was an impermissible violation of the permanent injunction, he was on notice as of the September 12, 2025 entry of the Court's Order Granting Plaintiff's Motion for Contempt. There, the Court explained that,

> going forward, Mr. Philipson shall not use MAA's whistleblower portal to allege any actions that he has previously complained of. To the extent Mr. Philipson has new, substantiated allegations to submit to MAA's whistleblower portal—which seems unlikely given that he has not been employed at MAA for more than four years—he shall be free to do so. Going forward, any use of the whistleblower portal that includes the submission of the same, previously submitted allegations will be deemed a violation of the permanent injunction's prohibition on harassing communications.

(ECF No. 285 at PageID 5266 n.3.)

Giving Mr. Philipson every benefit of the doubt, including that he was unaware of the restrictions on his use of MAA's whistleblower portal, the Court finds that Mr. Philipson will not be held liable for the 429 whistleblower submissions he made through the MAA portal between mid-January and September 12, 2025. See Gascho v. Glob. Fitness Holdings, LLC, 875 F.3d 795, 800, 801 (6th Cir. 2017) (explaining that, "when deciding whether a court order is 'definite

7

and specific,' courts must construe any ambiguity in favor of the party charged with contempt," as "the contempt power is reserved for parties that knowingly violate clear and specific commands of the court") (citations omitted).

Subtracting the 429 whistleblower submissions from the tally in MAA's table leaves a total of 934 violations of the permanent injunction by Mr. Philipson. Based on Mr. Philipson's admissions, as well as the Court's review of the evidence submitted in the declarations, there is clear and convincing proof that Mr. Philipson is liable for each of those 934 violations.

Accordingly, and consistent with the terms of the Court's Order Granting Plaintiff's Motion for Contempt, Mr. Philipson is subject to a $50 sanction for each of those violations, resulting in sanctions of $46,700. Although a significant penalty, Mr. Philipson's actions clearly violate the terms of the permanent injunction, and MAA has incurred significant costs as a result of those violations. MAA explained some of the costs triggered by Mr. Philipson's contemptuous activities, including having "been forced to expend valuable time and resources on cyber security to prevent Philipson from contacting its employees further"; that its "cyber security personnel have spent a significant amount of time configuring MAA's security systems to prevent Philipson from harassing its employees"; and that Mr. Philipson's "voluminous entries . . . made to the MAA whistleblower platform to harass and intimidate MAA have caused MAA to expend substantial resources to review and investigate each frivolous claim." (ECF No. 113 at PageID 2078); see also ECF No. 158 at PageID 2768 ("All of Philipson's false and harassing direct communications to MAA personnel causes disruption to MAA's business, has the potential to damage the relationship between MAA and its personnel, and forces MAA to expend time and resources on blocking Philipson's repeated communications.") Ultimately, and consistent with the Court's powers of contempt, it is hoped that the penalty will serve to both

8

"coerce [Mr. Philipson] into compliance with the court's order, and to compensate [MAA] for losses sustained." Gary's Elec., 340 F.3d at 379 (quoting United States v. United Mine Workers of Am., 330 U.S. 258, 303–04 (1947)).

Consistent with the foregoing, Mr. Philipson is liable to MAA for the monetary sanction of $46,700 for his past contemptuous conduct that violated the permanent injunction. The Court reiterates that Mr. Philipson may be subject to additional monetary sanctions for future violations of the permanent injunction upon the submission of such proof by MAA, consistent with the terms described in the Court's Order Granting Plaintiff's Motions for Contempt. (ECF No. 285.)

**IT IS SO ORDERED,** this 6th day of October, 2025.

> s/ Sheryl H. Lipman
> SHERYL H. LIPMAN
> CHIEF UNITED STATES DISTRICT JUDGE